IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| AMIE R. S., | § | |
| Plaintiff, | § | |
| | § | |
| | § | Civil Action No. 3:18-CV-2557-C-BH |
| | § | |
| ANDREW SAUL, | § | |
| COMMISSIONER OF SOCIAL | § | |
| SECURITY ADMINISTRATION, | § | |
| Defendant. | § | Referred to U.S. Magistrate Judge[1] |

<u>FINDINGS, CONCLUSIONS, AND RECOMMENDATION</u>

Amie R. S. (Plaintiff) seeks judicial review of a final decision by the Commissioner of Social

Security (Commissioner)[2] denying her claim for disability insurance benefits (DIB) under Title II

of the Social Security Act.  (*See* docs. 1; 18.)  Based on the relevant filings, evidence, and applicable

law, the Commissioner's decision should be **REVERSED**, and the case should be **REMANDED**

for reconsideration.

## I.  BACKGROUND

On March 18, 2015, Plaintiff filed her application for DIB, alleging disability beginning on

December 19, 2014. (doc. 13-1 at 221.)[3]  Her claim was denied initially on July 1, 2015 (*Id.* at 135),

and upon reconsideration on October 6, 2015 (*id.* at 136).  On October 27, 2015, Plaintiff requested

a hearing before an Administrative Law Judge (ALJ).  (*Id.* at 160.)  She appeared and testified at a

hearing on November 29, 2016.  (*Id.* at 70-123.)  At the hearing, she amended her alleged onset date

---

[1]By *Special Order No. 3-251*, this social security appeal was automatically referred for proposed findings
of fact and recommendation for disposition.

[2]At the time this appeal was filed, Nancy A. Berryhill was the Acting Commissioner of the Social Security
Administration, but Andrew Saul became the Commissioner of the Social Security Administration on June 17, 2019,
so he is automatically substituted as a party under Fed. R. Civ. P. 25(d).

[3]Citations to the record refer to the CM/ECF system page number at the top of each page rather than the
page numbers at the bottom of each filing.

to March 27, 2015.  (*Id.* at 77.)  On July 19, 2017, the ALJ issued a decision finding her not disabled.  (*Id.* at 31.)

Plaintiff timely appealed the ALJ's decision to the Appeals Council on September 25, 2017. (*Id.* at 218-20.)  The Appeals Council denied her request for review on July 25, 2018, making the ALJ's decision the final decision of the Commissioner.  (*Id.* at 5-7.)  She timely appealed the Commissioner's decision under 42 U.S.C. § 405(g).  (*See* doc. 1.)

### A.    Age, Education, and Work Experience

Plaintiff was born on May 17, 1970, and was 46 years old at the time of the hearing. (doc. 13-1 at 80, 221.) She had completed the eighth grade and could communicate in English.  (*Id.* at 80-81.)  She had past relevant work as an accounting clerk, a customer service clerk, and an underwriter. (*Id.* at 114-15.)

### B.    Medical, Psychological, and Psychiatric Evidence[4]

On April 6, 2015, Plaintiff presented to Cheri Andrews, D.O., with complaints of depression, hypertension, and anxiety.  (doc. 13-1 at 409-12.)  She reported depressed mood, difficulty concentrating, difficulty falling and staying asleep, diminished interest or pleasure, fatigue, and feelings of guilt and doom.  (*Id.* at 410, 412.)  When she returned to work in March 2015, she experienced severe anxiety parking in the underground garage.  (*Id.*)  She appeared tearful during the examination, but did not have suicidal ideation.  (*Id.* at 412.)  Dr. Andrews prescribed Ativan, Buspirone, Linzess, Lisino-HCTZ, Minocin, Pantoprazole, Proventil, Singulair, Sprintec, Trazodone, Valtrex, and Zofrana.  (*Id.* at 411.)  She advised Plaintiff that "if she got her med[ications] under better control, she could get back into the work force in some form or another." (*Id.* at 409.)

---

[4]Because only Plaintiff's psychological and psychiatric impairments are at issue, physical medical evidence is noted only when it includes information relevant to the mental impairments.

2

Plaintiff presented to Metrocare Services (Metrocare) for mental health treatment between April 7, 2015 and November 17, 2016. (*Id.* at 438-55, 475-89, 577-620, 646-53.) On April 7, 2015, Plaintiff was seen by Nadeem H. Bhatti, M.D., and reported that her medication was not controlling her depression and anxiety. (*Id.* at 439.) Her anxiety had begun in 2010, and her panic attacks had been increasing. (*Id.*) She was laid-off in December 2014, recently filed for bankruptcy, and had a disabled bipolar daughter at home. (*Id.*) She rated her depression as 8/10 and reported difficulty with concentration, loss of energy, fatigue, difficulty falling and staying asleep, and loss of interest and pleasurable things. (*Id.*) Plaintiff reported having panic attacks twice a day "with no specific trigger" and described her symptoms as sweatiness, shortness of breath, increased heart beat, racing, trembling, chest discomfort, dry mouth at night, numbness and Paresthesia in extremities, dizziness, brief intense fear, and hot flushes. (*Id.*) She could not park in a garage because she felt "something [was] going to happen" and was unable to go on an elevator without having a panic attack. (*Id.*) Dr. Bhatti noted that Plaintiff was adequately groomed, organized, and alert with depressed mood, and had intact memory, impaired attention, and fair insight, judgment, and logic. (*Id.* at 441.) She diagnosed major depressive affective disorder, and added Vistaril and Wellbutrin to Plaintiff's medication regimen. (*Id.*)

On May 11, 2015, Plaintiff returned to Metrocare and was seen by Elizabeth K. Olang, LPC, for counseling. (*Id.* at 445-50.) She reported feeling overwhelmed and depressed, decreased energy, and difficulty concentrating. (*Id.* at 448.) LPC Olang noted that she presented as sad with a labile mood, and had her continue her current medications. (*Id.* at 449.) On June 4, 2015, Plaintiff returned to LPC Olang for counseling and reported slight process with mood. (*Id.* at 451.) She also reported that she had enrolled in a GED program and had been actively participating and engaging. (*Id.*)

On June 29, 2015, State Agency Medical Consultant (SAMC) Richard Campa, Ph.D., completed a Psychiatric Review Technique (PRT) for Plaintiff. (*Id.* at 128-30.) He noted that she had non-severe essential hypertension and severe anxiety disorders, and found that she was mildly limited in activities of daily living and maintaining social functioning, moderately limited in maintaining concentration, persistence, and pace, and had no episodes of decompensation. (*Id.* at 129.) Dr. Campa found Plaintiff's medical records only partially supported her alleged functional limitations because they did not reflect a degree of mental/emotional signs or symptoms that would wholly compromise her capacity for work related abilities. (*Id.* at 129-30.) Dr. Campa also completed a mental RFC assessment and found that Plaintiff was maximally able to understand, remember, and carry out detailed but not complex instructions, make basic decisions, attend and concentrate for extended periods, interact with supervisors and coworkers, accept instructions, and respond to changes in a routine work setting. (*Id.* at 132.) SAMC Susan Posey, Psy., generally affirmed Dr. Campa's findings on October 1, 2015. (*Id.* at 143-47.)

Plaintiff presented to Metrocare for routine follow-up visits between June 2015 and October 2015. (*Id.* at 451-55, 487-89, 580-84.) On June 8, 2015, she reported "doing well over all" and continuing to work on her GED. (*Id.* at 452.) She denied experiencing depression, anxiety, mood swings, anger outbursts or aggression toward self or others. (*Id.*) The examining Advanced Practice Nurse (APN) noted that Plaintiff was "fairly stable on her current regimen." (*Id.* at 454.) On August 3, 2015, she reported that she "had to stop going for her GED classes due to anxiety" and "not being able to meet the work load." (*Id.* at 487-88.) She also reported feeling overwhelmed with taking care of her 26-year old bipolar daughter. (*Id.* at 487.) On October 6, 2015, she reported having depression with anxiety in the evenings, and that her medications were not effective at that time.

4

(*Id.* at 583.)  She also reported doing therapy "for a while" and agreed to continue therapy before adjusting her medication. (*Id.*)

On November 6, 2015, Plaintiff reported that her depression and anxiety symptoms had worsened due to recent family and financial stressors.  (*Id.* at 585.)  The examining APN recommended a follow-up with LPC Olang for better coping skills and adjusted her Vistaril dosage. (*Id.* at 587.)  On December 11, 2015, Plaintiff reported feeling "more anxious around the holidays" and being stressed out because she was unable to find a job.  (*Id.* at 590-91.)  She also reported poor sleep and being uncomfortable around people in social settings.  (*Id.* at 590.)  She was taken off Vistaril and started on Gabapentin for her anxiety. (*Id.* at 592.)  On January 20, 2016, she reported slight improvement in her anxiety with Gabapentin, and her dosage was increased.  (*Id.* at 597.)  She also reported better sleep and denied experiencing depression and psychosis symptoms. (*Id.*)

On March 2, 2016, Plaintiff reported doing better on current medications.  (*Id.* at 602.)  On April 1, 2016, she continued doing better on her current regimen, but had been struggling with anxiety, and her Gabapentin dosage for anxiety was increased.  (*Id.* at 608.)  On June 1, 2016, she reported that she was still struggling with depression because of her estranged relationship with her bipolar daughter, and her Wellbutrin dosage was increased.  (*Id.* at 613.)  On July 28, 2016, Plaintiff reported being stressed because of family health issues, but her medication regimen remained the same. (*Id.* at 618.)  On September 22, 2016, she reported depression and anxiety symptoms, and that family stressors had been affecting her mood, but she had no issues with sleep. (*Id.* at 649.)  Her Wellbutrin and Gabapentin dosage was increased, and she was encouraged to follow through with counseling sessions to improve coping skills. (*Id.*)

On October 13, 2016, Plaintiff went to Parkland for a diabetes follow-up appointment and

reported depression symptoms. (*Id.* at 631.) Due to mental health concerns, nursing staff referred her to a social worker for a psychosocial assessment the same day. (*Id.* at 638.) Plaintiff reported symptoms of anxiety, sadness, depression, irritability, and poor sleep, and believed her mental health issue would not improve. (*Id.*) Her bipolar daughter had gone to live with Plaintiff's mother because she was non-compliant with her mental health treatment and was being verbally abusive toward Plaintiff. (*Id.* at 639.)

On October 31, 2016, Dr. Ofomata completed a medical opinion questionnaire regarding Plaintiff's mental impairments. (*Id.* at 642-44). On the check-box questionnaire, he opined that on understanding and carrying out instructions, Plaintiff had no significant loss of ability to apply commonsense understanding to carry out simple one or two-step instructions, or to carry out detailed but uninvolved written or oral instructions. (*Id.* at 642.) On sustained concentration and persistence, he determined that Plaintiff had some loss of ability to demonstrate reliability by maintaining regular attendance and being punctual within customary tolerances, and had substantial loss of ability to maintain concentration or attention for at least two hours or to perform at a consistent pace without an unreasonable number and length of rest breaks. (*Id.*) Dr. Ofomata opined that on responding appropriately to supervision, coworkers, and usual work situations, Plaintiff had substantial loss of ability to ask simple questions or request assistance, and had extreme loss of ability to act appropriately with the general public, make simple work-related decisions, accept instructions and respond appropriately to criticism from supervisors, get along with coworkers or peers without unduly distracting them or exhibiting behavioral extremes, maintain personal appearance, or behave in an emotionally stable manner. (*Id.* at 642-43.) He also opined that on adapting to changes in a routine setting, Plaintiff had extreme loss of ability to respond appropriately to changes in a routine

work setting, and to cope with normal work stress or to finish a normal work week without exacerbating pathologically based symptoms. (*Id.* at 643.)

Dr. Ofomata diagnosed Plaintiff with major depressive disorder (recurrent episode, moderate), panic disorder, and unspecified personality disorder.  (*Id.*)  Certain clinical signs of mental illness had been observed throughout Plaintiff's treatment at Metrocare: anhedonia, sleep disturbance, low energy, chronic disturbance of mood, difficulty thinking/confusion, chronic depression, and panic attacks. (*Id.*)  Dr. Ofomata explained that his assessment of Plaintiff's limitations was consistent with any symptom improvements in the clinical notes because she had a residual disease process, and even a minimal increase in mental demand or environment change would likely cause her to decompensate.  (*Id.* at 644.)  He concluded that Plaintiff's symptoms or treatment would cause her to be absent from work for more than four days a month, and that her mental disorders are likely to exacerbate the degree of disability she experienced from her physical impairments.  (*Id.*)

**C.    Hearing**

On November 29, 2016, Plaintiff and a vocational expert (VE) testified at a hearing before the ALJ.  (*Id.* at 70-123.)  Plaintiff was represented by an attorney. (*Id.* at 72.)

**1.    Plaintiff's Testimony**

Plaintiff testified that she stopped going to school in ninth grade, but had started a GED program in June 2015. (*Id.* at 80-81.)  She last worked in March 2015, and had received unemployment benefits through May 2015, and from January 2016 through May 2016.  (*Id.* at 81-83.)  From 2008 to 2014, she worked at A-Affordable Insurance, where she did underwriting, billing, and customer service work from 2001 to 2008, and accounting work from 2008 until she was

laid off in December 2014. (*Id.* at 85-87.) She temporarily worked in bilingual customer service at a personal auto insurance company, but left because she did not have a GED. (*Id.* at 87-88.) In May 2015, she attempted to pursue her GED, but ultimately dropped out because she lived an unstable life and was unable to concentrate. (*Id.* at 89.)

In March 2015, she was on four medications because she was having panic attacks, during which her arm and cheek would get numb and her chest would tighten. (*Id.* at 89-90.) She first experienced a panic attack while driving in 2014, and went to the hospital because she thought she was having a heart attack. (*Id.* at 90.) She saw her primary doctor, Dr. Andrews, and was prescribed Ativan to take at work because it would calm her down faster. (*Id.*) Plaintiff started going to Metrocare because she had several panic attacks, and she was prescribed Hydroxyzine for depression and Buspar for anxiety and panic attacks. (*Id.* at 90-91.)

When asked about her panic attack triggers, Plaintiff responded that she struggled all her life "trying to make it in this world." (*Id.* at 91-92.) She was a single parent with two kids and had a troubled marriage because her husband had been sexually molesting their son. (*Id.* at 92.) She filed charges against her husband and obtained professional help for her son to help deal with his emotions. (*Id.*) She also struggled with her daughter, who was diagnosed as bipolar in 2013. (*Id.*)

In March 2015, she attempted to work at an insurance company, but left after one week because she had to take over 100 calls and felt overwhelmed. (*Id.* at 93.) She had to go to the bathroom several times each day to calm herself down, and her arm and cheek would get numb. (*Id.*) Because she experienced panic attacks in parking garages, she would have to go to work "extra early" to find parking on the street. (*Id.*) She needed her medications to calm herself down at work because she worked on the twelfth floor and felt horrible on the elevator. (*Id.* at 94.)

8

When she was forced to stop working, she became "severely depressed," was crying a lot, could not get out of bed, and would skip taking showers for days. (*Id.* at 94.) She experienced racing thoughts because she did not have health insurance and struggled paying her bills and mortgage. (*Id.* at 94-95.) When she was pursuing her GED, she was only taking one class for three hours a night, but was "barely trying to keep up with what we were taking about in class and making notes." (*Id.* at 95-96.) She dropped out after two weeks because she could not keep up and would have to constantly go to the restroom to calm herself down. (*Id.* at 96-97.) The classes made her anxious because she was unable to focus and struggled to keep up. (*Id.* at 97.) During a three hour class, she needed four breaks lasting five to ten minutes to calm herself. (*Id.* at 98-99.)

Even though she stopped going to class and work, the frequency of panic attacks remained the same. (*Id.* at 99.) Plaintiff's medications were adjusted, but they affected her nerves and caused the joints in her arms to hurt. (*Id.*) In October 2015, Plaintiff began taking Gabapentin, and her nerve and joint pain stopped. (*Id.* at 99-100) Her daughter had been living with Plaintiff's mother since August 2016, because she was unable to take care of her anymore. (*Id.* at 100-01.) On average, Plaintiff experienced four panic attacks a week lasting 20 minutes at a time, even when on her medication. (*Id.* at 101.) She was unable to function for six hours after a recent attack, and was tired, fatigued, and unable to concentrate. (*Id.*) If she experienced similar attacks while working, she would need time to lay down and recover. (*Id.* at 102.) She got overwhelmed doing household chores like sweeping, cooking, and doing laundry, and would go to the grocery store late at night or early in the morning to avoid people. (*Id.* at 102-03.)

Plaintiff rarely attended family functions and avoided conversations with people because she did not want to socialize. (*Id.* at 104.) When experiencing depression, she would lose interest in

9

things like watching television, and would skip bathing for a day or two. (*Id.* at 104-05.) She got anxious sitting longer than 30 minutes at a time and needed to walk and pace. (*Id.* at 107-08.) She often needed to lie down during the day because she did not sleep well at night, and her medication made her drowsy and tired. (*Id.* at 108-09.) She was unable to carry more than 10 pounds at a time because she got fatigued, and she needed a dolly to carry things while walking. (*Id.* at 109-10.) She took Neurontin to maintain functioning because she was on the maximum dosage for Buspar. (*Id.*)

Plaintiff had an "understanding boss" at her long-term job who allowed her frequent breaks when she had a mental health episode at work. (*Id.* at 111-12.) Her coworkers sometimes helped her in the restroom during a panic attack because she felt like fainting or falling. (*Id.* at 113.) Even though her medication and mental health treatment had changed since she stopped working, she thought she would still miss workdays because her mental condition kept escalating. (*Id.* at 113-14.)

### 2.    VE's Testimony

The VE testified that Plaintiff had previous work experience as an accounting clerk, which was sedentary work with a SVP of 5; a customer service clerk, which was sedentary work with a SVP of 5; and an underwriter, which was sedentary work with a SVP of 7. (*Id.* at 114-15.) A hypothetical person with the same age, education, and work experience history as Plaintiff, who had some physical limitations and could only do work that consisted of simple, routine, repetitive tasks performed in a work environment free of fast-paced production requirements involving only simple work-related decisions, and with few, if any, workplace changes and involving no more than occasional interaction with the public or coworkers, would not be capable of performing her past work because her past relevant work involved simple, routine, repetitive work and was considered skilled. (*Id.* at 115-16.) There was other available work that the hypothetical person could perform,

including garment sorter (light and SVP-2) with 75,000 jobs nationally; garment packager (light and SVP-2) with 47,000 jobs nationally; and marker or marking clerk (light and SVP-2) with 206,000 jobs nationally, all of which were consistent with the DOT. (*Id.* at 116-18.)  If the same hypothetical person was also unable to work in coordination with or close proximity to others having essentially no interaction with the public or coworkers and unable to persist a work effort for a full eight-hour workday without frequent unscheduled rest breaks and being absent, tardy or leaving work early more than three times per week, she would not be able to maintain and sustain any job in the national economy. (*Id.* at 117-18.)  An individual with substantial loss in her ability to maintain concentration, attention, and stay on task for an extended period, and unable to respond appropriately to changes in a routine work setting from 11 to 20 percent of the workday or work week, would not be able to sustain competitive employment.  (*Id.* at 120-22)  Additionally, chronic absenteeism of three days or more a month would preclude competitive work.  (*Id.* at 120-21.)

## D.    ALJ's Findings

The ALJ issued a decision denying benefits on July 19, 2017. (*Id.* at 18-31.)  At step one, she found that Plaintiff had not engaged in substantial gainful activity since her amended onset date of March 27, 2015.[5]  (*Id.* at 21.)  At step two, the ALJ found that she had the following severe impairments: obesity, diabetes mellitus type 2, anxiety, and depression. (*Id.*)  Despite those impairments, at step three, the ALJ found that Plaintiff had no impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in the social security regulations. (*Id.* at 22.)

Next, the ALJ determined that Plaintiff retained the RFC to perform light work as defined

---

[5]The decision listed this date as March 27, 2014 (doc. 13-1 at 21, 31), but at the hearing, the onset date was amended to March 27, 2015 (*id.* at 77).

in 20 C.F.R. § 404.1567(b), with the following limitations: lift/carry twenty pounds occasionally and ten pounds frequently; stand/walk and/or sit six hours in an eight-hour workday; occasionally climb ramps or stairs, but never ladders, ropes, or scaffold; avoid concentrated exposure to dust, fumes, odors, gas, or poor ventilation; understand, remember, and carry out simple, routine, repetitive tasks performed in a work environment free of fast-paced production requirements, involving only simple, work-related decisions, and with few, if any, workplace changes; and occasional interaction with the public and coworkers. (*Id.* at 24.) At step four, the ALJ determined that Plaintiff was unable to perform her past work as an accounting clerk, a customer service clerk, or an underwriter. (*Id.* at 29.) At step five, the ALJ found that although Plaintiff was not capable of performing past relevant work, considering her age, education, work experience, and RFC, there were other jobs that existed in significant numbers in the national economy that she could perform. (*Id.* at 30.) Accordingly, the ALJ determined that Plaintiff had not been under a disability, as defined by the Social Security Act, at any time from March 27, 2015, the alleged onset date, through the date of the ALJ's decision. (*Id.* at 31.)

## II.  STANDARD OF REVIEW

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. §§ 405(g), 1383(C)(3). Substantial evidence is defined as more than a scintilla, less than a preponderance, and as being such relevant and sufficient evidence as a reasonable mind might accept as adequate to support a conclusion. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995). In applying the substantial evidence standard, the reviewing court does not

reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236. A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program. *Davis v. Heckler*, 759 F.2d 432, 435 (5th Cir. 1985). Moreover, the relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are identical to those governing the determination under a claim for supplemental security income. *See id.* The court may therefore rely on decisions in both areas without distinction in reviewing an ALJ's decision. *See id.*

To be entitled to social security benefits, a claimant must prove that he or she is disabled as defined by the Social Security Act. *Leggett*, 67 F.3d at 563-64; *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988). The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step inquiry to determine whether a claimant is disabled:

1. An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2. An individual who does not have a "severe impairment" will not be found to

13

be disabled.

3.      An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4.      If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

5.      If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f)).

Under the first four steps of the analysis, the burden lies with the claimant to prove disability. *Leggett*, 67 F.3d at 564. The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id.* Once the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step five to show that there is other gainful employment available in the national economy that the claimant is capable of performing. *Greenspan*, 38 F.3d at 236. This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations or by expert vocational testimony or other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). A finding that a claimant is not disabled at any point in the five-step review is conclusive and terminates the analysis. *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

## III. ISSUES FOR REVIEW

Plaintiff presents two primary issues for review:

1.      The Commissioner's policy is that she will always give greater weight to a treating source's opinion than to the opinions of non-treating sources. If the Administrative Law Judge rejected the treating source opinions about [Plaintiff's] mental functioning without following the regulatory

requirements for weighing opinion evidence, was the residual functional capacity determination supported by substantial evidence?

    a.    Medical Opinions are important evidence when determining a claimant's residual functional capacity.

    b.    Dr. Ofomata's opinion constitutes a medical opinion within the meaning of the regulations.

    c.    The ALJ, in finding controlling weight should not be assigned to Dr. Ofomata's treating source statement, erred in failing to recognize the opinion was still entitled to deference.

    d.    The Fifth Circuit reaffirmed the holding in *Newton* that an ALJ must explicitly apply the 404.1527 factors absent a contrary treating or examining opinion.

2.    The Administrative Law Judge's error harmed [Plaintiff].

    a.    The ALJ's hypothetical question, on which the ALJ relied, was not supported by substantial evidence. The vocational expert's testimony in response to the errant hypothetical question was not substantial evidence.

    b.    When additional limitations from Dr. Ofomata's opinion were presented in a hypothetical question, the vocational expert testified no jobs were available.

(doc. 18 at 6-7.)

## A.    <u>Treating Source Opinion</u>[6]

Plaintiff argues that the ALJ erred during the RFC determination because she did not apply

the regulatory factors of 20 C.F.R. § 404.1527 when rejecting Dr. Ofomata's medical opinion about

her mental limitations and in not identifying "another treating or examining physician's opinion that

---

[6]On January 18, 2017, the Administration updated the rules on the evaluation of medical evidence. *See* 82 Fed. Reg. 5844, 5853 (Jan. 18, 2017). For claims filed on or after March 27, 2017, the rule that treating sources be given controlling weight was eliminated. *See Winston v. Berryhill*, 755 F. App'x 395, 402 n.4 (5th Cir. 2018) (citing 20 C.F.R. § 404.1520c(a) ("We will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s)"). Because Plaintiff filed her application before the effective date, the pre-2017 regulations apply.

contradicted this treating source opinion." (doc. 18 at 14.)

The ALJ "is responsible for assessing the medical evidence and determining the claimant's residual functional capacity." *Perez v. Heckler*, 777 F.2d 298, 302 (5th Cir. 1985). A reviewing court must defer to the ALJ's decision when substantial evidence supports it, even if the court would reach a different conclusion based on the evidence in the record. *Leggett*, 67 F.3d at 564. Nevertheless, the substantial evidence review is not an uncritical "rubber stamp" and requires "more than a search for evidence supporting the [Commissioner's] findings." *Martin v. Heckler*, 748 F.2d 1027, 1031 (5th Cir. 1984) (citations omitted). Courts "must scrutinize the record and take into account whatever fairly detracts from the substantiality of the evidence supporting the" ALJ's decision. *Id.* They may not reweigh the evidence or substitute their judgment for that of the Commissioner, however, and a "no substantial evidence" finding is appropriate only if there is a "conspicuous absence of credible choices" or "no contrary medical evidence[.]" *See Johnson*, 864 F.2d at 343 (citations omitted).

Although every medical opinion is evaluated regardless of its source, the Commissioner generally gives greater weight to opinions from a treating source. 20 C.F.R. § 404.1527(c)(2). A treating source is a claimant's "physician, psychologist, or other acceptable medical source" who provides or has provided a claimant with medical treatment or evaluation, and who has or has had an ongoing treatment relationship with the claimant. *Id.* at § 404.1502. When "a treating source's opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence," the Commissioner must give such an opinion controlling weight. *Id.* at § 404.1527(c)(2). If controlling weight is not given to a treating source's opinion, the

Commissioner considers six factors in deciding the weight given to each medical opinion: (1) whether the source examined the claimant or not; (2) whether the source treated the claimant; (3) the medical signs and laboratory findings that support the given opinion; (4) the consistency of the opinion with the record as a whole; (5) whether the opinion is made by a specialist or non-specialist; and (6) any other factor which "tend[s] to support or contradict the opinion." *See id.* at § 404.1527(c)(1)-(6).

While an ALJ should afford considerable weight to opinions and diagnoses of treating physicians when determining disability, sole responsibility for this determination rests with the ALJ. *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000). If evidence supports a contrary conclusion, an opinion of any physician may be rejected. *Id.* Nevertheless, "absent reliable medical evidence from a treating or examining physician controverting the claimant's treating specialist, an ALJ may reject the opinion of the treating physician only if the ALJ performs a detailed analysis of the treating physician's views under the criteria set forth in [then] 20 C.F.R. § 404.1527(d)(2)." *Id.* at 453. A detailed analysis is unnecessary, however, when "there is competing first-hand medical evidence and the ALJ finds as a factual matter that one doctor's opinion is more well-founded than another" or when the ALJ has weighed "the treating physician's opinion on disability against the medical opinion of other physicians who have treated or examined the claimant and have specific medical bases for a contrary opinion." *Id.* at 458.

Here, Dr. Ofomata provided a check-box questionnaire in which he considered Plaintiff's mental impairments and diagnosed her with major depressive disorder (recurrent episode, moderate), panic disorder, and unspecified personality disorder. (doc. 13-1 at 642-44.) He opined that she had no significant loss of ability to apply commonsense understanding to carry out simple one or

two-step instructions and detailed but uninvolved written or oral instructions, and had some loss of ability to maintain regular attendance and be punctual. (*Id.* at 642.) Dr. Ofomata determined that Plaintiff had a "substantial loss of ability" to maintain concentration, maintain attention/stay on task for an extended period (being 2 hours), and perform at a consistent pace without an unreasonable number and length of breaks, and had an "extreme loss of ability" to act appropriately with the general public, accept instructions, get along with coworkers or peers, and adapt to change and cope with stress. (*Id.* at 642-43.) He explained his assessment of Plaintiff's limitations was consistent with any symptom improvements in the clinical notes because she had a residual disease process in which even a minimal increase in mental demand or environment change would likely cause her to decompensate. (*Id.* at 644.) He concluded that Plaintiff's symptoms or treatment would cause her to be absent from work for more than four days a month, and that her mental disorders were likely to exacerbate the degree of disability she experienced from her physical impairments. (*Id.*)

After reviewing the evidence of record, the ALJ ultimately assigned "limited probative weight" to Dr. Ofomata's opinion, finding it inconsistent with the treatment notes. (*Id.* at 29.) She pointed out that the medical record demonstrated that Plaintiff had "normal and organized thoughts, normal attention, fair judgment and insight, [and] an intact memory," and that she had not reported "any difficulty with concentration." (*Id.*)

Although the ALJ's decision does not identify Dr. Ofomata as Plaintiff's treating physician, the Commissioner does not dispute that he qualifies as a treating source under 20 C.F.R. § 404.1502. (*See* docs. 13-1 at 29; 21 at 9-10.)[7]  Because there was no competing medical opinion from an

---

[7]The medical records identified Dr. Ofomata as Plaintiff's "attending physician" at her office visits at Metrocare between April 2015 and November 2016, but it is not clear that he met with her or that he signed off on her records. (doc. 13-1 at 438-55, 475-89, 578-620, 647-53.) While courts in this district have differentiated between the medical opinions of various doctors at Metrocare when considering the opinions of treating physicians,

examining physician, the ALJ was required to apply the six factors before refusing to accept parts of Dr. Ofomata's opinion. *See Walker v. Barnhart*, 158 F. App'x 534, 535 (5th Cir. 2005) (quoting *Newton*, 209 F.3d at 458). While the ALJ's decision explained that opinion evidence had been considered "in accordance with the requirements of 20 CFR 404.1527," it does not appear to clearly consider or apply these factors. (doc. 13-1 at 24.) The decision appears to address only one "key factor" noting that Dr. Ofomata's opinion was inconsistent with the treatment notes. (*Id.*) It noted that the record demonstrated that Plaintiff had "normal and organized thoughts, normal attention, fair judgment and insight, [and] an intact memory" with no reports of "any difficulty with concentration," and ultimately gave Dr. Ofomata's opinion "limited probative weight." (*Id.*) The decision does not address that Dr. Ofomata was Plaintiff's treating source since April 2015, nor that his medical specialty was in psychiatry and neurology. (*See* doc. 13-1 at 438-55, 475-89, 578-620, 647-53); *see Abadie v. Barnhart*, 200 F. App'x 297, 298 (5th Cir. 2006) (holding that the "ALJ was not required to accept [the treating source's] opinions, but was required to consider them, and if he chose to reject them, to explain what conflicting evidence informed his choice"); *see, e.g., Patino v. Colvin*, No. 3:15-CV-618-BF, 2016 WL 1664912, at *7 (N.D. Tex. Apr. 25, 2016) (citing 20 C.F.R. § 404.1527(c)(5)) ("Further absent from the ALJ's decision is any discussion regarding Keith Harbour, D.O.'s specialization, as a Doctor of Osteopathic Medicine, although the ALJ is to generally give more weight to the opinion of a specialist regarding medical issues related to his area

---

neither party disputes that Dr. Ofomata had actually treated or examined Plaintiff at these appointments. *See, e.g., Payne v. Colvin*, No. 3:14-CV-2557-BH, 2016 WL 5661647, at *12 (N.D. Tex. Sept. 28, 2016) (finding no error when the ALJ determined that a Metrocare "supervising psychiatric" was not a treating source because it was "not clear if she actually examined the plaintiff in person because the 'service provider' listed by Metrocare Services was actually [a different individual]"); *Bookman v. Colvin*, 3:13-CV-4428-B, 2015 WL 614850, at *8 & n.3 (N.D. Tex. Feb. 12, 2015) (noting the inconsistency between the medical records of the treating physician at Metrocare and other Metrocare professionals).

of specialty than to the opinion of a non-specialist."). Moreover, the medical records indicated multiple times that Plaintiff had complained of having difficulty with concentration. (*See* doc. 13-1 at 410-12, 439-41, 446, 448, 488.)

The Commissioner argues that it was proper for the ALJ to assign limited probative weight to Dr. Ofomata's opinion as it was only a brief and conclusory check-box questionnaire. (doc. 21 at 10-11.) The Fifth Circuit has recognized that opinions of treating physicians are not entitled to considerable weight when they are brief and conclusory and lack explanatory notes or supporting objective tests and examinations. *See Heck v. Colvin*, 674 F. App'x 411, 415 (5th Cir. 2017); *Foster v. Astrue*, 410 F. App'x 831, 833 (5th Cir. 2011). Nevertheless, "there is no binding authority requiring the court to reject a checklist as a medical opinion." *Gittens v. Astrue*, No. CIV.A. 304CV2363-L, 2008 WL 631215, at *5 (N.D. Tex. Feb. 29, 2008). Even though Dr. Ofomata's opinion was based on a check-box questionnaire, it identified the clinical signs of Plaintiff's mental illness that had been observed when he assessed the severity of her condition, and explained that the assessment of Plaintiff's limitations was consistent with the clinical notes given her residual disease process. (*See* doc. 13-1 at 644.) Notably, the ALJ's decision did not mention the check-box questionnaire as a factor in the weight she assigned to Dr. Ofomata's opinion. *See Newton*, 209 F.3d at 455 (explaining that the Commissioner's decision must stand or fall with the reasons stated in the ALJ's final decision); *Gittens*, 2008 WL 631215, at *5 ("While on remand, an ALJ may find that the checklist is inconsistent with other medical evidence, but that determination must be made by the ALJ, not the court.").

Because the ALJ's decision did not address consideration of the necessary factors under 20 C.F.R. § 404.1527(c), the ALJ erred when evaluating Dr. Ofomata's treating source opinion. *See*

*Kneeland v. Berryhill*, 850 F.3d 749, 760 (5th Cir. 2017) (explaining that "absent reliable medical evidence from a treating or examining physician controverting the claimant's treating specialist, an ALJ may reject the opinion of the treating physician *only* if the ALJ performs a detailed analysis of the treating physicians views under the criteria set forth in [20 C.F.R. § 404.1527(c)(2)]") (emphasis in original).

**B.    Harmless Error**

Because "[p]rocedural perfection in administrative proceedings is not required" and a court "will not vacate a judgment unless the substantial rights of a party have been affected," Plaintiff must show she was prejudiced by the ALJ's failure to rely on medical opinion evidence in assessing her RFC.  *See Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988) (per curiam).  To establish prejudice, she must show that the ALJ's failure to rely on a medical opinion as to the effects her impairments had on her ability to work casts doubt onto the existence of substantial evidence supporting her disability determination.  *See McNair v. Comm'r of Soc. Sec. Admin.*, 537 F. Supp. 2d 823, 837 (N.D. Tex. 2008) ("Procedural errors in the disability determination process are considered prejudicial when they cast doubt onto the existence of substantial evidence in support of the ALJ's decision.") (citing *Morris v. Bowen*, 864 F.2d 333, 335 (5th Cir. 1988)).

The ALJ's failure to rely on a medical opinion in determining Plaintiff's RFC casts doubt as to whether substantial evidence exists to support the finding that she is not disabled.  *See Williams*, 355 F. App'x at 832 (finding the decision denying the claimant's claim was not supported by substantial evidence where the RFC was not supported by substantial evidence because the ALJ rejected the opinions of the claimant's treating physicians and relied on his own medical opinions as to the limitations presented by the claimant's back problems in determining the RFC); *see also*

*Thornhill v. Colvin*, No. 14-CV-335-M, 2015 WL 232844, at *11 (N.D. Tex. Dec. 15, 2014) (finding prejudice "where the ALJ could have obtained evidence that might have changed the result—specifically, a medical source statement"), *adopted by* 2015 WL 232844 (N.D. Tex. Jan. 16, 2015).  Accordingly, the error is not harmless, and remand is required on this issue.[8]

## IV. RECOMMENDATION

The Commissioner's decision should be **REVERSED**, and the case should be **REMANDED** for further proceedings.

**SO RECOMMENDED**, on this 29th day of February, 2020.

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

## INSTRUCTIONS FOR SERVICE AND
## NOTICE OF RIGHT TO APPEAL/OBJECT

A copy of these findings, conclusions and recommendation shall be served on all parties in the manner provided by law.  Any party who objects to any part of these findings, conclusions and recommendation must file specific written objections within 10 days after being served with a copy.  *See* 28 U.S.C. § 636(b)(1); Fed. R. at Civ. P. 72(b).  In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions and recommendation where the disputed determination is found.  An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific.  Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error.  *See Douglass v. United Servs. Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

---

[8] Because this error requires remand, and the ALJ's consideration of Dr. Ofomata's opinion may affect the remaining issue, it is unnecessary to reach it.

22